Per Curiam:
This case comes before the court on the opinion, findings of fact and recommendation for conclusion of law filed by Trial Commissioner Richard Arens on March 23, 1965, pursuant to the provisions of Rule 67 (c) with ref *578 erence to defendant’s motion to dismiss filed July 10, 1964, and defendant’s motion to adopt the opinion and findings of fact of commissioner filed June 18, 1965. Upon consideration thereof, the court agrees with the commissioner’s findings, his opinion, and his recommended conclusion of law, as hereinafter set forth, and it hereby adopts the same as the basis for its judgment in this case. Defendant’s said motions are granted. Plaintiff is therefore not entitled to recover and the petition is dismissed.
OPINION OP COMMISSIONER
The sole question before the court in this case is whether plaintiff’s evidence establishes misrepresentation by defendant of a material fact on which plaintiff relied to its detriment. At the trial, after plaintiff 'had completed presentation of its evidence, defendant moved for a dismissal under the authority of Buie 67 (c) on the ground that on the facts and the law plaintiff had not Shown a right to recover. Buling on the motion was withheld pending the filing by defendant of a written motion to dismiss which was granted by the trial commissioner. Plaintiff filed no opposition to the motion, nor did plaintiff file requested findings of fact, objections to defendant’s requested findings of fact or a brief on the law. Although plaintiff’s default might well afford ground for disposition of the case, it is clear that the evidence of record offered by plaintiff does not meet the criteria prescribed in the decided cases to sustain an action for misrepresentation.
The facts which are detailed in the accompanying findings of fact may be stated succinctly 'as follows. Plaintiff, a New York corporation, received a request for a proposal from the U.S. Army Corps of Engineers for the clearing of flood-created debris from river channels and banks in connection with a disaster-relief operation known as Operation Noah near Granby, Connecticut.
The contract documents did not state the mileage of the channels and banks to be cleared, nor were there any drawings or sketches. The specifications stated that “the width of the areas to be cleared has been designated by the Corps of Engineers through painted or staked 'boundaries.” The area *579 to be cleared was divided into segments which, were described in the specifications by reference to certain landmarks (bridges, 'highways, etc.), as marked.
In general, the debris to be cleared was not uniformly scattered over the entire area but was lodged here and there, and there were large spaces (1 or 2 acres) in which there was no debris and, accordingly, no work to be done. Precise measurements of lengths of the winding river channels and banks to be cleared were not practicable. Accordingly, the only measurements were estimates derived from maps of the general area and from speedometer readings of cars driven over the roads adj acent to the river channels.
Prior to making its proposal, plaintiff’s vice-president, who subsequently signed plaintiff’s proposal, physically inspected the areas outlined in the specifications and familiarized himself with the work to be done. Plaintiff was awarded the contract work on segments A, B, and D, but, before execution of a formal negotiated contract, new flooding occurred and caused additional debris to be deposited in the area. Plaintiff’s vice-president, in company with defendant’s representatives, made a new inspection of the work areas where the location of the debris was clearly visible. Thereafter, it was agreed that the contract price would be increased to reimburse plaintiff for the additional work caused by the new flooding, and a formal contract was entered into by the parties.
After a series of warnings to plaintiff, because of the delay in completing the work and an extension of the completion date, defendant finally terminated the contract for default.
Plaintiff made claim for additional compensation before the contracting officer and alleged that it had sustained substantial losses because of a number of factors, including “misrepresentation by the Government of the mileage contained in the segments to be cleared.” In a subsequent meeting, however, regarding possible relief to plaintiff, plaintiff’s representative stated “that it was withdrawing any claim based on the misrepresentation by the Government as to the mileage involved in the contract work, explaining that subsequent measurement by the claimant (plaintiff) disclosed that the Government estimate was correct.”
*580 Following an adverse decision by the contracting officer on plaintiff’s claim for additional compensation, plaintiff appealed to the Board of Contract Appeals of the Corps of Engineers, before which plaintiff’s vice-president testified, without Objection, that prior to submission of plaintiff’s proposal a Lieutenant Bradley (now deceased), who was in the office of defendant’s resident engineer, Captain Gerald Kelley, advised him that the length of segment A was 4.6 miles, the length of segment B was 6 miles, and the length of segment I) was 2 miles, making a total of the three segments of 12.6 miles. In dismissing plaintiff’s appeal, the Board found that there was no evidence of misrepresentation, but that the matter sounded in breach of contract over which the Board had no jurisdiction to grant relief.[1]
Plaintiff initially claimed damages in this court on the basis of four counts of alleged breach of contract, but in a pretrial conference plaintiff dismissed the first three counts, leaving only the fourth count in which plaintiff seeks reformation of the contract 'because of 'alleged misrepresentation. At the pretrial conference, a number of exhibits, including the transcript of the hearing before the Board, were, without objection, admitted in evidence.
At the trial of the case, Major (formerly Captain) Gerald Kelley, who had been defendant’s resident engineer, was produced as plaintiff’s only witness. He reaffirmed the testimony which he had previously given before the Board and testified that the figure of 12.6 miles for the total mileage of segments A, B, and D was “used in the office as a reference of how much ground we were talking about,” and that, “In conversation, if a man asked us how. far it was, I can remember we used this 12.6 as to how much the mileage was.”
From the foregoing, the crucial facts may be summarized as follows:
1. There was no representation in the contract documents as to the length of the segments to be cleared.
2. Before the contract was entered into, plaintiff’s representative made two physical inspections of the area to be *581 cleared and saw for himself tbe outline of the work to be done.
3. Precise measurements of lengths of the winding river channels and banks to be cleared were not practicable, and, moreover, were not a necessary element in determining the amount of work to be done.
4. Plaintiff’s representative stated to defendant’s representatives that plaintiff was withdrawing any claim based on misrepresentation and that subsequent measurement by plaintiff disclosed that the Government estimate of the mileage involved was correct.
5. There is no evidence that the Government estimate was not substantially correct, or that plaintiff was misled.
The only “representation” contained in the evidence is testimony, admitted without objection before the Board, by plaintiff’s vice-president concerning the statement allegedly made by a lieutenant in the office of defendant’s resident engineer, plus the oblique admission by the resident engineer at the trial that “if a man asked us how far it was, I can remember we used this 12.6 as to how much the mileage was.” Aside from the question of the weight to be given to the quotation of the statement of the deceased lieutenant, it does not appear that his statement was any more than an estimate or approximation which, under the circumstances, could not have formed a firm basis for determining the amount of work to be done. The same may fairly be said of any statements which the resident engineer may have made regarding the mileage of the segments.
To justify reformation of a contract on the ground of misrepresentation, the evidence of such misrepresentation must be clear and convincing. Associated Traders, Inc. v. United States, 144 a. Cl. 744, 169 F. Supp. 502 (1959). The party seeking relief on the ground of misrepresentation must show not only that the representation was false, but that 'he was actually misled by it: The Midland Land and Improvement Company v. United States, 58 Ct. Cl. 671 loc. cit. 683 (1923), aff'd, 270 U.S. 251 (1926).
*582 Tbe record does not sustain plaintiff’s allegation of misrepresentation nor form a basis for reformation of the contract.
Findings or Fact
Tlris report is submitted pursuant to a motion made under the authority of Pule 67(c). At the trial, after plaintiff had completed the presentation of its evidence, defendant moved for a dismissal of the action on the ground that, on the facts and the law, plaintiff had not shown a right to recover. The trial commissioner withheld ruling on the motion pending the filing of a written motion to dismiss which Was subsequently filed by defendant. Plaintiff filed no opposition to the motion.[2] Thereafter, an order was entered by the trial commissioner granting the motion to dismiss.
1. (a) Plaintiff, a New York corporation, entered into a contract with defendant, acting through the TJ.S. Army Corps of Engineers, for the clearing of flood-created debris near Granby, Connecticut, in connection with a disaster-relief operation known as Operation Noah.
(b) Plaintiff alleges, in essence, that prior to the time that it made its proposal, defendant’s agent misrepresented to plaintiff the mileage to be cleared, in that the agent stated that the mileage of certain segmente of the work totaled 12.6 miles; whereas, the actual mileage was approximately 16 miles; that in reliance thereon, plaintiff made its proposal; and, that, as a consequence, it suffered damages. Plaintiff accordingly seeks reformation of the contract on the ground of misrepresentation.
2. (a) On October 8, 1955, there was issued by the area office of the U.S. Army Corps of Engineers, Unionville, Connecticut, a request for proposals for furnishing all plant, labor, equipment, and materials for clearing five segments of designated river channels and banks, in accordance with certain specifications.
(b) The specifications stated that “the width of the areas to be cleared has been designated by the Corps of Engineers through painted or staked boundaries.” No mileage figure for the length of any segment was stated in any of the con *583 tract documents, nor were any drawings or sketches furnished to plaintiff. Three segments, pertinent to the instant action, were described in the specifications as follows:
* * * * >!:
Segment A
West Branch, Salmon Brook — Town of Granby:
From a point approximately 200 feet above the Granby-Hartland town lines, to the Simsbury Eoad Bridge, as marked. Also included is an unnamed 'brook paralleling the Barkhamsted road from its confluence with the West Branch of the Salmon Brook, to a point 200 feet above the bridge at the junction of Barkhamsted Eoad and Broad Hill road.
# # # &
Segment B
West Branch, Salmon Brook — Town <of Granby:
From the Simsbury Eoad 'bridge to the Farmington Eiver, as marked.
This segment includes shifting the brook to the left bank at Bushy Hill Farm, requiring an excavation approximately 12 feet wide, 3 feet deep and 400 feet long. * * * * *
Segment D
Belden Brook — Town of Granby
From the Donahue Eoad Bridge upstream, approximately 2 miles, to a point above the summer cottage on the Huff property. Also included in this segment is Bing Brook for approximately 600 feet above its confluence with Belden Brook.
This segment also includes replacing Belden Brook in its former channel, immediately above-the Donahue Eoad Bridge. The old Channel is to he opened 10 feet wide and 4 feet deep for a distance of approximately 300 feet.
H»
3. Prior to making its proposal, plaintiff’s vice-president, who subsequently signed plaintiff’s proposal, physically inspected the areas outlined in the specifications and familiarized himself with the work to be done. In general, the debris to be cleared was not uniformly scattered over the entire area, but was lodged here and there. There were within the total *584 area large spaces (1 or 2 acres) in which there was no debris and, accordingly, no work to be done. Precise measurements of lengths of the winding river channels and banks to be cleared were not practicable. Accordingly, the only measurements were estimates derived from maps of the general area and from speedometer readings of cars driven over roads adjacent to the river channels. These estimates, made by army engineers, were 12.6 miles for the total length of segments A, B, and D.
4. (a) On October 13,1955, the proposals of several contractors were opened. The lowest bidder asked permission to withdraw and was permitted to do so.
(b) Plaintiff was second low bidder on segments A, B, and D. Accordingly, 'Captain 'Gerald Kelley, defendant’s resident engineer, called plaintiff’s vice-president on the telephone and arranged to confer with him at the captain’s office on the following day.
(c) On October 14, 1955, Captain Kelley and plaintiff’s vice-president discussed in detail the scope of the contract work, the manner in which plaintiff proposed to perform it, and the amount of labor and equipment which would be employed. In discussing an estimate of the cost of the work to 'be done, plaintiff’s vice-president “mentioned his method of estimating which was to get an acreage figure and apply a figure of so many dollars to an acre of total acreage and come up with a price,” and Captain Kelley described the method which he had used, namely, “to visit the site, determine how many dozers would be worked and how long would be required to finish this particular part, and how much labor * *
(d) On Captain Kelley’s recommendation, plaintiff was awarded the contract for the work on segments A, B, and D.
5. (a) On October 15,16$ and 17,1955, prior to the execution of a formal negotiated contract with plaintiff, new flooding occurred and caused additional debris to be deposited in the area including segments A, B, and D. Defendant informed plaintiff that the new flooding was a material change in conditions and that plaintiff would be permitted to withdraw from the contract or that the contract price would be appropriately amended for the work on each segment:
*585 ('b) On October 18, 1955, plaintiff’s vice-president, in the company of defendant’s representatives, made a new inspection of the work areas to determine the extent of the additional work required by reason of the new flooding. Although the new flooding brought new debris to the three segments, A, B, and D, it also resulted in washing away some of the old debris. The location of the debris after the new flooding was clearly visible on the new inspection.
(c) Following the new inspection of October 18, 1955, further negotiations were conducted by defendant and plaintiff and it was agreed that an additional 25 percent for segment A, an additional $1,000 for segment B, and an additional 30 percent for segment D would be added to the contract price to reimburse plaintiff for the additional work caused by the new flooding. Plaintiff executed and delivered to defendant three letters in which plaintiff agreed to accept the additional sums and further agreed that no further claim would be made because of .changed conditions created by the new flooding.
6. (a) On October 24, 1955, plaintiff entered into the contract for the clearing of the river channels and banks in segments A, B, and D for a contract price of $49,700. The contract contained the standard disputes clause, but omitted the usual changed condition article. A work completion date of “on or about 15 November 1955” was included unchanged from the completion date shown in the original request for proposals.
(b) Plaintiff commenced work on October 25, 1955, but the work proceeded slowly and was not completed on or about November 15,1955, as required by the contract.
7. (a) By letter of January 30, 1956, defendant called to plaintiff’s attention its lack of progress and requested plaintiff to advise defendant of its intentions for stepping up the progress of the work or to Show cause why the contract should not be terminated. A similar letter, dated February 2,1956, was sent to plaintiff from defendant.
(b) On February 14,1956, representatives of plaintiff and defendant met in the area office of the U.S. Army Corps of Engineers, at which time plaintiff’s representative stated that it had already lost a substantial sum of money on the contract *586 and requested that the completion date for segments B and D be extended to February 28,1956.
(c) By letter dated February 15,1956, defendant granted plaintiff’s request of February 14,1956, and advised plaintiff that defendant expected the work on segment A to be completed as soon 'as possible.
8. (a) On April 2, 1956, plaintiff, through its attorneys, requested relief on the basis of hardship loss sustained under the contract.
(b) By telegram dated April 26,1956, plaintiff was notified by defendant that its right to proceed was terminated for default, that it would be held responsible for 'any excess costs incurred by defendant in the completion of the work, and that formal confirming notice would follow. No formal notice was ever furnished, but plaintiff did no further work and the contract was thenceforth treated by ’both plaintiff and defendant as terminated.
9. (a) In support of its claim for additional compensation before the contracting officer, plaintiff alleged that it sustained substantial losses because of a number of factors, including “misrepresentation by the Government of the mileages contained in the segments to be cleared.”
(b) On March 7,1957, representatives of plaintiff and defendant met in the New England division office of the U.S. Army Corps of Engineers, at which time plaintiff’s request for relief was discussed in detail. Plaintiff’s representative stated “that it Was withdrawing any claim based on the misrepresentation by the Government as to the mileage involved in the contract work, explaining that subsequent measurement by the claimant (plaintiff) disclosed that the Government estimate was correct.”
(c) On March 14, 1957, the contracting officer issued his decision denying plaintiff’s claim for additional compensation. Regarding the issue of alleged misrepresentation, the contracting officer stated in his decision:
It is unnecessary to consider the claimant’s allegation that the Government misrepresented the mileage involved in the three 'Segments. At the meeting on 7 March 1957 the claimant stated that subsequent measurement of the three Segments disclosed that the mileage stated by the Government was correct.
*587 The contracting officer’s ultimate conclusion was that the loss which plaintiff allegedly sustained was not due to conditions for which the Government was responsible, but to the failure of plaintiff to mobilize sufficient labor and equipment so that the work could be performed as contemplated.
10. (a) On February 18, 19, and 20, 1958, following appeal by plaintiff from the decision of the contracting officer, the Board of Contract Appeals of the Corps of Engineers conducted a hearing at which plaintiff adduced the testimony of witnesses and in which a number of exhibits were introduced in evidence.
(b) Plaintiff’s vice-president testified, without abjection, that prior to submission of plaintiff’s proposal a Lieutenant Bradley (now deceased), who was in the office of defendant’s resident engineer, Captain Gerald Kelley, advised him that the length of segment A was 4.6 miles, the length of segment B was 6 miles, and the length of segment D was 2 miles, making a total of the three segments of 12.6 miles.
(c) On June 25,1958, the Board rendered its decision dismissing plaintiff’s appeal.[3] Regarding the issue of alleged misrepresentation, the Board stated:
On the question of -mileage, the contract again speaks for itself and is conspicuously silent in this regard. No misrepresentation in this respect is evident, hut if it were, again we lack authority since such a matter sounds in breach of contract over which we have no jurisdiction to grant relief.
11. (a) On August 18, 1961, plaintiff filed suit in this court, alleging four separate counts of breach of contract.
(b) At a pretrial conference, held on October 29, 1963, plaintiff’s counsel moved to dismiss, with prejudice, the first three counts of its petition. The motion was allowed. In count four, which remains, plaintiff seeks reformation of the contract because of alleged misrepresentation. At the pretrial conference a number of exhibits, including the transcript of the hearing before the Board of Contract Appeals of the Corps of Engineers, were, without objection, admitted in evidence. At the pretrial conference defendant dismissed its counterclaim.
*588 12. At the trial of the case, Major (formerly Captain) Gerald Kelley, who had been defendant’s resident engineer, was produced as plaintiff’s only witness. He reaffirmed the testimony which he had previously given before the Board of Contract Appeals of the Corps of Engineers and testified that the figure of 12.6 miles for the total mileage of segments A, B, and D was “used in the office as a reference of how much ground we were talking about,” and that, “In conversation, if a man asked us how far it was, I can remember we used this 12.6 as to 'how much the mileage was.”
13. Plaintiff has not established that defendant made a misrepresentation of a material fact on which plaintiff relied to its detriment.
CONCLUSION OP LAW
Upon the basis of the findings of fact of the commissioner, which are adopted by the court, and the foregoing opinion of the commissioner which is made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover and the petition is therefore dismissed.

 Docket No. 134.6, decided June 25, 1958.

 Plaintiff has not filed requested findings of fact, objections to defendant’s requested findings of fact or a brief on the law.

 Docket No. 1346, decided June 25, 1958.